DEBRA HILLS,

Plaintiff,

VERSUS

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

────────────────

**MEMORANDUM AND ORDER**
July 7, 2017

────────────────

JOSEPH F. BIANCO, District Judge:

*Pro se* plaintiff Debra Hills ("plaintiff") commenced this action, pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("SSA"), challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying plaintiff's application for disability insurance benefits. An Administrative Law Judge ("ALJ") found that plaintiff had the residual functional capacity to perform the full range of work at all exertional levels with certain nonexertional limitations, of which there were a significant number of jobs in the national economy, and, therefore, that plaintiff was not disabled. The Appeals Council denied plaintiff's request for review.

The Commissioner now moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Plaintiff did not file an opposition or a cross-motion. In any event, the Court has still considered the merits of the petition. For the reasons set forth below, the Court finds that the Commissioner's decision was based upon the application of the correct legal standards and is supported by substantial evidence. Accordingly, the Commissioner's motion for judgment on the pleadings is granted.

I. BACKGROUND

A. Facts

The following summary of the relevant facts is based on the Administrative Record ("AR") developed by the ALJ. (ECF No. 10.)

1. Personal History

Plaintiff was born on January 6, 1988 and resides in Farmingdale, New York. (AR 31.) Education records from Brennan High School reflect that, in testing performed when she was 16 years old, plaintiff achieved a full-scale IQ score of 95, a performance IQ score of 100, and a verbal IQ score of 87. (*Id.* 235.)

Plaintiff received counseling and special education services for emotional and behavioral difficulties. (*Id*. 234, 268, 273.) She was schooled in a New York State regular assessment program with accommodations. (*Id*. 234, 265.)

2. Relevant Medical History

Plaintiff received mental health care from Nurse Practitioner ("NP") Michele Kelly in February 2013, when she complained of depression, weight gain, and difficulty finding a job. (*Id*. 321-22.) NP Kelly recorded plaintiff's subjective complaints and prescribed a three-month supply of Vyvanse, a central nervous system stimulant; and Cymbalta, a medication for depression and anxiety; as well as Ativan, to use on an as-needed basis for anxiety. (*Id*.) The following month, NP Kelly again documented plaintiff's subjective complaints and noted that plaintiff reported no adverse reaction to the medication. (*Id*. 322.) In April 2013, NP Kelly adjusted plaintiff's medication regimen, which had not caused any side effects, but was ineffective. (*Id*. 323.) Plaintiff next saw NP Kelly twice in June 2013, and she did not alter plaintiff's medication regimen. (*Id*.) NP Kelly again documented plaintiff's reported condition, and plaintiff was reportedly happier on her new medications and sleeping better. (*Id*.)

Plaintiff was evaluated by endocrinologist Dr. Nicoleta Ionica in June 2013. (*Id*. 341-44.) Plaintiff reported weight gain, back pain, anxiety, emotional lability, depression, and sleep disturbances. (*Id*. 342.) Upon examination, plaintiff was fully oriented, alert, and appropriate, and her thyroid was normal. (*Id*. 342-43.) Her sensation was intact, a motor exam revealed no dysfunction, and her strength and reflexes were normal. (*Id*. 343.) Dr. Ionica also observed that plaintiff's eyes, lungs, heart, abdomen, and skin were normal. (*Id.*) Dr. Ionica assessed polycystic ovary syndrome ("PCOS"), ordered lab work, and instructed plaintiff to follow up in two weeks. (*Id*. 343-44.)

The following month, Dr. Ionica's physical examination findings were unchanged. (*Id*. 345-47.) Dr. Ionica again assessed PCOS, reviewed the results of a blood test, recommended fish oil, encouraged exercise, and prescribed treatment for a Vitamin D deficiency and to improve plaintiff's insulin sensitivity. (*Id*. 348.)

Plaintiff next saw NP Kelly in August 2013, at which point NP Kelly adjusted plaintiff's medication regimen. (*Id*. 324.) At her next visit in September 2013, NP Kelly attributed much of plaintiff's anxiety and depression to a possible hormonal imbalance. (*Id*. 325.) Notes reflected dyslexia, a sleep disorder, panic attacks with agoraphobia, and attention deficit hyperactivity disorder ("ADHD"). (*Id*. 326.) In October 2013, plaintiff expressed an interest in losing weight, noting that she was distracted but not depressed. (*Id*. 334.) Plaintiff expressed difficulty finding work in November 2013. (*Id*. 327.) NP Kelly again recorded plaintiff's subjective complaints and detailed her medication regimen. (*Id*.)

During a January 2014 visit, NP Kelly conducted a mental status examination of plaintiff in which she described plaintiff's appearance as casual and clean, and her attitude as cooperative; noted that plaintiff related well; and rated plaintiff's speech as within normal limits. (*Id*. 357-58.) NP Kelly observed that plaintiff maintained good eye contact and an appropriate affect, but that she exhibited a depressed and anxious mood. (*Id*. 358.) NP Kelly found plaintiff's thought processes to be oriented, goal-directed, and coherent, and that she measured full thought content without hallucinations and paranoia. (*Id*.) Plaintiff's fund of information,

attention, and concentration were all "fair." (*Id*.) Subsequent treatment visits with NP Kelly, in March, April, May, and July 2014, did not reflect a material change in plaintiff's condition or further examination findings. (*Id*. 359-64.)

Plaintiff presented to internist Dr. Scott Stein at Stony Brook Internists in August 2014 for a check-up. (*Id.* 368.) Plaintiff complained of worsening headaches, and Dr. Stein ordered a magnetic resonance imaging ("MRI") scan of the brain to monitor her prolactinoma. (*Id*.) Dr. Stein also observed an obese abdomen. (*Id*. 370.) He diagnosed plaintiff with anxiety, prolactinoma, PCOS, multiple nevi (atypical moles), an ingrown toenail, high cholesterol, and diabetes. (*Id*. 370-71.) In assessing a treatment plan, Dr. Stein characterized plaintiff's depression as stable and noted that she was cooperative; had an appropriate mood, affect, and normal judgment; and was non-suicidal. (*Id*.) He recommended that plaintiff continue taking Lexapro and advised her to avoid fatty foods. (*Id*. 371.) An MRI scan of the brain and pituitary gland was performed four days later and revealed a small, stable left-sided macroadenoma that was unchanged from a prior examination. (*Id*. 372.)

3. Medical Opinion Evidence

On July 2, 2013, plaintiff's gynecologist, Dr. Lisa Rimpel, opined that plaintiff had no functional limitations and was not disabled. (*Id*. 289-93.)

Plaintiff attended an internal medicine consultative examination with Dr. Andrea Pollack on July 23, 2013. (*Id*. 300-03.) Plaintiff reported that she had been taking oral medication for "prediabetes" since 2013 and had been experiencing neck and hip pain since a car accident in 2009. (*Id.* 300.) She also noted left ankle pain since age 15 after tearing ligaments in gym class, but was never hospitalized for these conditions. (*Id*.) Plaintiff stated that she was able to cook, clean, do laundry, shop, shower, and dress on a daily basis, and that she also watched television and socialized with friends. (*Id*. 301.) Dr. Pollack's physical examination findings noted slightly reduced flexion and adduction of the left hip. (*Id*. 301-02.) X-rays of plaintiff's lumbosacral spine and ankle were negative. (*Id*. 303-05.) Dr. Pollack assessed prediabetes, neck pain, left hip pain, and left ankle pain, for which plaintiff's prognosis was "good." (*Id*. 303.) Vocationally, Dr. Pollack opined that plaintiff had a mild restriction in walking, climbing stairs, and standing. (*Id*. 303.)

Plaintiff also appeared for a psychological consultative examination with Dr. Kathleen Acer on July 23, 2013. (*Id*. 296-99.) Plaintiff drove herself to the examination and reported difficulty sleeping, increased appetite, depressive symptoms, distractibility, and panic attacks several times per year. (*Id*. 296.) She denied symptoms of mania, a thought disorder, or thoughts of suicide. (*Id*.) Plaintiff acknowledged that she could dress, bathe, groom herself, cook, clean, wash laundry, shop and drive. (*Id.* 298.) She did not manage finances. (*Id*.) Plaintiff socialized with friends and otherwise spent her time taking care of her birds and doing household chores. (*Id*.)

Upon mental status examination, Dr. Acer observed that plaintiff was pleasant and cooperative, dressed appropriately, well groomed, that her motor behavior was normal, and that she exhibited appropriate eye contact. (*Id*. 297.) Plaintiff's speech was clear and fluent, she exhibited adequate language skills, and her thought processes were coherent and goal directed. (*Id*.) Plaintiff exhibited the full range of affect, a euthymic (normal) mood, and clear senses. (*Id*.) She was fully oriented, and her attention, concentration, and memory were

3

all intact. (*Id.*) Dr. Acer measured plaintiff's "intellectual skills" as average, her fund of information as appropriate to experience, and her insight and judgment as "good." (*Id.* 297-98.)

Dr. Acer diagnosed dysthymic disorder. (*Id.*) Vocationally, Dr. Acer opined that plaintiff did "not appear to be significant[ly] limit[ed] in her ability to follow and understand directions and instructions, perform tasks, maintain attention and concentration, and maintain a regular schedule." (*Id.*) Dr. Acer said that plaintiff "may have some difficulty dealing with stress and making appropriate decisions." (*Id.*) Dr. Acer concluded that "[t]he results of the evaluation d[id] appear to be consistent with some psychiatric issues; however, in and of themselves they d[id] not appear to be significant enough to interfere with functioning on a daily basis." (*Id.*)

4. Other Source Opinion Evidence

NP Kelly completed a "Psychiatric Assessment for Determination of Employability" form regarding plaintiff for the Suffolk County Department of Social Services on April 10, 2013. (*Id.* 286-87.) She noted diagnoses of anxiety not otherwise specified ("NOS"), panic disorder with agoraphobia, depression NOS, ADHD, and a Global Assessment of Functioning ("GAF") score of 35-50. (*Id.* 286.) NP Kelly checked boxes on the form indicating that plaintiff never experienced acute psychiatric hospitalization, hospitalization for alcohol/drug use or attempted suicide; that she occasionally needed medical hospitalization or emergency room visits and occasionally decompensated; and that plaintiff experienced frequent loss of job or failure to complete an education or training program, and behavior that interferes with activities of daily living. (*Id.* 287.) NP Kelly also checked boxes corresponding to "[n]o evidence of limitation" for "[m]aintains basic standards of personal hygiene and grooming," and "[a]bility to use public transportation." (*Id.* 287.) NP Kelly checked boxes corresponding to "[m]oderately limited" for "[u]nderstands and remembers simple instructions," "[m]aintains attention and concentration," "[i]nteracts appropriately with others," "[m]aintains socially acceptable behavior," and ability to perform "[l]ow stress, simple tasks." (*Id.*) NP Kelly checked boxes corresponding to "[v]ery limited" for "[u]nderstands and remembers complex instructions" and "[m]aintains attention and concentration." (*Id.*) NP Kelly checked a box endorsing that plaintiff was incapable of participating in activities such as employment, education, training, work experience, or vocational rehabilitation/ treatment. (*Id.*)

On April 18, 2014, NP Kelly filled out a "Medical Assessment of Claimant's Ability to Perform Work Related Activities in a Mental Impairment Claim" form regarding plaintiff. (*Id.* 335-38.) NP Kelly checked form prompts corresponding to "[g]ood" for "[a]bility to follow work rules," "[u]se judgment," and "[m]aintain personal appearance." (*Id.* 336-37.) NP Kelly checked "[f]air" for plaintiff's ability to "[d]eal with the public" and "[u]nderstand, remember, and carry out simple job instructions." (*Id.*) NP Kelly checked "[m]arkedly impaired" for plaintiff's ability to "[r]elate to co-workers"; "[i]nteract with supervisors"; "[f]unction independently"; "[m]aintain attention/concentration"; "[u]nderstand, remember, and carry out complex job instructions"; "[u]nderstand, remember and carry out detailed, but not complete job instructions"; "[b]ehave in an emotionally stable manner"; "[r]elate predictably in social situations"; and "[d]emonstrate reliability." (*Id.*) NP Kelly checked "[p]oor or none" for plaintiff's

4

ability to "[d]eal with work stresses" and "[m]aintain schedules in daily routine." (*Id*.). In an addendum attached to the same form, NP Kelly circled form prompts corresponding to "[m]oderate" for plaintiff's impairment in personal habits of the claimant and in her ability to perform simple and repetitive tasks. (*Id*. 339-40.) NP Kelly circled "[m]oderately severe" for plaintiff's limitation in ability to relate to other people, restriction of daily living activities, constriction of interest, ability to carry out and remember instructions, and ability to respond appropriately to supervision and co-workers. (*Id*.) NP Kelly circled "[s]evere" for plaintiff's limitation in ability to respond to customary work pressures, perform varied or complex tasks, and tolerate basic work-related stresses. (*Id*.)

NP Kelly completed the Suffolk County form a second time, without addendum, on December 31, 2014, and checked form prompts corresponding to "[f]air" for plaintiff's ability to "[u]se judgment, "[m]aintain personal appearance" and "[b]ehave in an emotionally stable manner." (*Id*. 353-55.) NP Kelly checked "[m]arkedly impaired" for plaintiff's ability to "[f]ollow work rules"; "[r]elate to co-workers"; "[d]eal with the public"; "[f]unction independently"; "[m]aintain attention/concentration"; "[u]nderstand, remember, and carry out complex job instructions"; "[u]nderstand, remember and carry out detailed, but not complete job instructions"; "[u]nderstand, remember and carry out simple job instructions"; "[r]elate predictably in social situations"; and "[d]emonstrate reliability." (*Id*.) NP Kelly checked "[p]oor or none" for plaintiff's ability to "[i]nteract with supervisor[s]"; "[d]eal with work stresses"; and "[m]aintain schedules in daily routine." (*Id*.)

5. Plaintiff and Expert Testimony

Plaintiff completed a Function Report on June 30, 2013 in which she reported daily activities that included checking her computer, eating meals, taking medication, running errands, talking to friends, and helping her parents around the house unless she was having a bad day. (*Id*. 172.) She cared for pets and had no difficulty attending to her own personal care. (*Id*.) Plaintiff prepared meals—such as frozen entrees, soup, sandwiches, chicken, rice, and pasta—on a daily basis. (*Id*. 173.) Around the house, plaintiff engaged in cleaning, laundry, weeding the garden, and cleaning dishes. (*Id*. 174.) She went outside at least five times per day and was able to drive. (*Id*. 174-75.) Plaintiff shopped in stores and online and did not pay bills or count change, but she managed a savings account. (*Id*. 175.) Her hobbies included birds, reading, watching television, sewing, and using the computer. (*Id*.) She socialized with friends one to five times per week and participated weekly in a role-playing game group. (*Id*. 176.)

Plaintiff testified at the January 12, 2015 administrative hearing that she was 27 years old, had a driver's license, and had achieved a GED. (*Id*. 31-32.) She previously worked briefly in retail and full-time at a salon for four-and-a-half months. (*Id*. 32.) Plaintiff testified that she was unable to work due to anxiety and depression, for which she received treatment from NP Kelly, which included Lexapro and Ativan. (*Id*. 32-34.) She said that she left her retail job at Toys "R" Us because she "started getting really bad anxiety" and did not want to waste anyone's time, and she testified that she did not get along with her supervisors and found them condescending. (*Id*. 39-41.) Plaintiff said that she might be capable of performing a low-stress job from home depending on her "moods" during the day. (*Id*. 42.)

5

Plaintiff had never been hospitalized for anxiety or depression, but she had visited the emergency room once, in 2011. (*Id*. 33-34.) Plaintiff helped her parents around the house with folding laundry, preparing dinner, and setting the table. (*Id*. 35.) She went out to shop for food and clothes and to attend Zumba classes every other week. (*Id*. 36-37.) Her hobbies included "science-fiction stuff, fantasy, horror stuff," and knitting crafts. (*Id*. 44.) On a typical day, she spent a little time with her family, with whom she lived, and about eight hours on the computer, using Facebook, YouTube, reading articles, and playing games. (*Id*. 31, 35, 43-44.) Plaintiff testified that she found it difficult to get out of bed in the morning and that she usually did not wake up until the early afternoon. (*Id*. 39.)

Vocational Expert ("VE") Rocco Meola also appeared and testified at the January 12, 2015 administrative hearing. (*Id*. 44-49.) After concluding that plaintiff had no past relevant work, the ALJ asked VE Meola to assume a hypothetical individual with plaintiff's vocational profile who could perform work at all exertional levels, but was limited to performing simple, routine, repetitive tasks; low stress jobs, defined as no work at fixed production rate pace, with work that is checked at the end of the workday or workweek rather than hourly or throughout the day; and positions with only occasional contact with coworkers and supervisors, and no contact with the general public. (*Id*. 45-46.) The ALJ then asked VE Meola whether there were jobs that such an individual could perform. (*Id*. 46.) VE Meola testified that such an individual could perform the unskilled, light exertional jobs of: (1) Labeler (Dep't of Labor, Dictionary of Occupational Titles ("DOT") code 920.687-126), 170,000 jobs nationally; (2) Bagger (DOT code 582.687-010), 20,000 jobs nationally; and (3) Microfilm mounter (DOT code 208.685-022), 150,000 jobs nationally. (*Id*. 46.) VE Meola stated that his testimony was consistent with the DOT. (*Id*. 47.)

B. Procedural History

On May 8, 2013, plaintiff filed an application for supplemental Social Security Income, alleging that she was disabled beginning on March 9, 2013. (*Id*. 141-42.) On August 5, 2013, the claim was denied (*id*. 74-78), and plaintiff subsequently requested a hearing before an ALJ (*id*. 83-85). On January 12, 2015, plaintiff appeared with counsel and testified at the hearing, and VE Meola also appeared and testified. (*Id*. at 27-50.) The ALJ issued an unfavorable decision denying plaintiff's claim on March 16, 2015. (*Id*. at 7-21.) The Appeals Council denied plaintiff's request for review of the ALJ's decision on May 9, 2016, making the ALJ's March 16, 2015 decision the final decision of the Commissioner. (*Id*. at 1-4.)

Plaintiff filed this *pro se* action seeking reversal of the ALJ's decision on July 13, 2016. (ECF No. 1.) The Court received the administrative record on October 17, 2016. (ECF No. 10.) The Commissioner filed a motion for judgment on the pleadings on December 16, 2016. (ECF No. 12.) By Orders dated February 17, 2017 and April 19, 2017, the Court granted plaintiff extensions of time to file her opposition and/or cross-motion. (ECF Nos. 16, 18.) On June 6, 2017, the Commissioner informed the Court that plaintiff had failed to timely file her opposition and/or cross-motion (ECF No. 21), and, that same day, the Court ordered plaintiff to submit a letter indicating whether she stipulated to dismissal of this action, or whether she consented to the Court deciding this action based on the complaint, the underlying administrative record, and defendant's motion papers (ECF No. 22). By letter dated June 8, 2017 and docketed on June 9, 2017, plaintiff said that she had "hit a wall" in researching a response to the

Commissioner's motion and had refused to stipulate to closing the case. (ECF No. 23.)

The Court has fully considered all of the submissions in this action, including the administrative record.

## II. STANDARD OF REVIEW

A district court may set aside a determination by an ALJ "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek v. Colvin*, 802 F.3d 370, 374-75 (2d Cir. 2015) (citing *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); 42 U.S.C. § 405(g)). The Supreme Court has defined "substantial evidence" in Social Security cases to mean "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted); *see Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013). Further, "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (internal citation omitted); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner.").

## III. DISCUSSION

### A. The Disability Determination

A claimant is entitled to disability benefits if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the SSA unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the

7

claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with respect to the first four steps; the Commissioner bears the burden of proving the last step. *Id.*

The Commissioner "must consider" the following in determining a claimant's entitlements to benefits: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

B. Analysis

After carefully reviewing the ALJ's decision and the medical evidence that was before him, the Court finds that substantial evidence supports the ALJ's decision to deny plaintiff benefits under the SSA.

1. Steps One Through Three

Applying the five-step inquiry set forth by the regulations, the ALJ found, at step one, that plaintiff had not engaged in substantial gainful activity since May 8, 2013, her application date. (AR. 12.)

At step two, the ALJ found that plaintiff had severe impairments of depression and anxiety. (*Id.* 12-13.) The ALJ concluded that "[t]hese impairments impose[d] more than minimal limitations regarding overall functioning." (*Id.* 12.) In addition, the ALJ determined that plaintiff's PCOS and diabetes mellitus were "non-severe impairments" because plaintiff's care had been "routine and symptomatic in nature"; no restrictions were noted or could be reasonably discerned; and Dr. Rimpel had opined that plaintiff was not disabled, which the ALJ afforded "considerable weight" because "the record as a whole fail[ed] to demonstrate that [plaintiff's PCOS could], in any way, be considered a severe impairment." (*Id.*)

The ALJ also afforded "some weight" to Dr. Pollack's opinion that plaintiff had "mild restrictions regarding walking, climbing stairs and standing presumably based on [plaintiff's] complaints of neck pain" because those findings were "consistent with the record as a whole." (*Id.*) However, the ALJ noted that "complaints of pain cannot serve to establish a severe impairment." (*Id.*) Finally, the ALJ considered the results of plaintiff's August 2014 check-up, which diagnosed "routine ailments of anxiety, prolactinoma, an ingrown toenail, multiple nevi (none of which appeared suspicious), [PCOS], high cholesterol and diabetes mellitus . . . ." (*Id.* 12-13.) He concluded that "no functional restrictions were noted nor [could] any reasonably be discerned." (*Id.* 13.)

The Court finds that substantial evidence supports the ALJ's determination that plaintiff's anxiety and depression constituted severe impairments and that plaintiff's physical ailments were non-severe. *See Barnhart v. Walton*, 535 U.S. 212, 218 (2002) (holding that a severe "'impairment' must last 12 months and also be severe enough to prevent the claimant from engaging in virtually any 'substantial gainful

work'" (quoting 42 U.S.C. § 423(d)(2)(A)); *see also* 20 C.F.R. §§ 416.909, 416.920(a)(4)(ii).

At step three, the ALJ found that plaintiff's severe impairments did not meet or equal the criteria of any impairment that is listed in Appendix 1 of the regulations and, accordingly, concluded that plaintiff was not *per se* disabled. (AR. 13-16.) The ALJ said that "the severity of [plaintiff's] mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06." (*Id.* 16.) He determined that plaintiff had a "mild restriction" in "activities of daily living"; "moderate difficulties" in "social functioning" and regarding "concentration, persistence or pace"; and had experienced no episodes of "decompensation" of extended duration. (*Id.*)

Because the record lacks any evidence that plaintiff's mental impairments "functionally equal" either (1) marked limitations in two domains of functioning or (2) extreme limitation in one domain, the Court also agrees with the ALJ's determination on this issue. *See Frye v. Astrue*, 485 F. App'x 484, 487 (2d Cir. 2012) ("A 'marked limitation' is a limitation that is 'more than moderate but less than extreme.'"); *Gonzalez ex rel. Guzman v. Sec'y of U.S. Dep't of Health & Human Servs.*, 360 F. App'x 240, 244 (2d Cir. 2010) (holding that "a disabling depressive condition pursuant to Subsection C under Section 12.04 . . . requires plaintiff to demonstrate, *inter alia*, a medically documented history of chronic affective disorder that lasted at least 2 years and that caused more than a de minimis adverse impact on [plaintiff's] ability to work").

2. Step Four

Because the ALJ determined that plaintiff did not have a severe impairment considered *per se* disabling, he continued to step four of the analysis—to ascertain plaintiff's residual functional capacity ("RFC") despite her severe impairments. *New York v. Sullivan*, 906 F.2d 910, 913 (2d Cir. 1990).

The ALJ concluded that plaintiff had the RFC

> to perform a full range of work at all exertional levels but with the following non-exertional limitations: she is limited to simple, routine repetitive tasks, and low stress jobs which means no work at a fixed production rate pace, with work that is checked at the end of the work day or work week rather than hourly or throughout the day. In addition, [plaintiff] is limited to occasional contact with co-workers and supervisors and no contact with members of the general public.

(AR. 16.)

The ALJ noted that plaintiff "testified that she is unable to work due to anxiety and depression"; did not "like to be around crowds and spen[t] most days in her room on the computer and with her bird"; but went "out with friends a few times a month," had "good family relationships," and had been in a "romantic relationship." (*Id.* 17.). In addition, plaintiff said that she was able to complete daily chores and drive herself. (*Id.*)

The ALJ found that the "documentary record, viewed in its entirety, fail[ed] to comport with a finding of disability." (*Id.*) He reviewed NP Kelly's treatment notes from February 2013 through November 3013 and concluded that they "reflect[ed]

9

allegations of anxiety and depression" and that NP Kelly had prescribed various medications, but reported "little, if any, mental status/clinical findings." (*Id.*) The ALJ also reviewed NP Kelly's April 2013 Suffolk County assessment, which diagnosed "panic disorder, anxiety and depression" and opined that plaintiff was "very limited regarding her ability to understand complex instructions and maintain attention and concentration" and moderately limited with respect to understanding simple instructions, interacting appropriately with others, and maintaining socially appropriate behavior. (*Id.* 18.) The ALJ said that he fully considered NP Kelly's opinion notwithstanding its categorization as an "Other Medical Source,"[1] but he afforded it "little weight" because it was "inconsistent with the record as a whole, most particularly Ms. Kelly's lack of clinical findings." (*Id.*)

The ALJ further noted that NP Kelly's notes from January 2014 through July 2014 evince "largely subjective complaints of anxiety and depression" and indicate that plaintiff stated that she could not "get a job" or "interact with the public"; however, the ALJ said that NP Kelly's January 2014 mental status examination "paint[ed] a different picture" because it said that plaintiff's "appearance was casual and clean"; "[h]er attitude was cooperative and she related well"; and her eye contact and affect were normal. (*Id.*) In addition, plaintiff did not experience panic attacks, hallucinations, or paranoia, and she was oriented with a full fund of information. (*Id.*)

Moreover, the ALJ afforded "little weight" to NP Kelly's April and December 2014 assessments because her statements therein that she had seen plaintiff twice monthly since 2011 were not supported by the treatment notes. (*Id.*) Further, the ALJ found that the evaluations "appear[ed] to be predicated on subjective complaints, as there [was] little objective evidence of record." (*Id.*)

Finally, the ALJ afforded "great weight" to Dr. Acer's opinion because of her "specialty in the field of psychology," her "complete examination" of plaintiff, and the consistency of her clinical findings with her conclusion. (*Id.* 19.) He noted that Dr. Acer reported that plaintiff could perform daily chores and drive herself, and that her "[m]ental status examination was largely unremarkable." (*Id.* 18-19.) Dr. Acer also reported normal mood, affect, orientation, and cognitive functioning and opined that plaintiff was not significantly limited vocationally, aside with some difficulties in dealing with stress and making appropriate decisions. (*Id.* 19.)

Based on the foregoing findings and the weight ascribed to each opinion, the ALJ concluded that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible . . . ." (*Id.*) As a result, the ALJ determined that plaintiff was not totally disabled, but rather retained the RFC to perform "basic tasks associated with work" with some limitations. (*Id.*)

After reviewing the record, the Court finds that the ALJ's conclusions regarding plaintiff's RFC are supported by substantial evidence. The Court notes that, although an opinion from an "other medical source" such as a nurse practitioner is not afforded the controlling weight of the treating physician

---

[1] "Other Medical Source" evidence is "evidence from a medical source that is not objective medical evidence or a medical opinion . . . ." 20 C.F.R. § 404.1513(a)(3).

rule, the ALJ must still consider it as probative evidence and "weigh that opinion according to a number of factors, including the length, nature, and extent of the treatment relationship and the frequency of examination; evidence in support of the opinion; the opinion's consistency with the record as a whole; and other relevant factors." *Evans v. Colvin*, 649 F. App'x 35, 38-39 (2d Cir. 2016) (citing 20 C.F.R. §§ 404.1502, 404.1513(d)(1), 404.1527(c)). However, the ALJ need not recite and apply every regulatory factor in assessing an "other source" opinion. *See Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013). Further, as noted, "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve." *Veino v. Barnhart*, 312 F. 3d 578, 588 (2d Cir. 2002).

Here, the Court finds that the ALJ properly afforded "great weight" to Dr. Acer's consultative examination and "little weight" to NP Kelly's various opinions based on the former's consistency with the medical evidence and the latter's divergence from such evidence and reliance on plaintiff's subjective complaints. In addition, the ALJ fully considered plaintiff's length of treatment history with NP Kelly and properly discounted NP Kelly's statement that plaintiff could not engage in employment because such an assessment is reserved to the Commissioner.[2] *See Harris v. Colvin*, 561 F. App'x 81, 82 (2d Cir. 2014).

Taken as a whole, the administrative record demonstrates that plaintiff was capable of self-care and social interaction with certain limitations due to her depression and anxiety. Thus, the ALJ's determination that plaintiff's "social limitations did not render [her] totally disabled was supported by evidence that, in the context of numerous examinations, [plaintiff] demonstrated a stable affect, memory for details, and willingness to cooperate with questioning," as well as "evidence that [plaintiff] was able to attend and participate appropriately with numerous medical doctors and evaluators" and "could perform the activities of daily living." *Roma v. Astrue*, 468 F. App'x 16, 19-20 (2d Cir. 2012). In sum, the Court finds no basis for disturbing the ALJ's finding that plaintiff was not totally mentally disabled, but rather retained RFC to perform basic tasks in a low-stress environment with minimal supervision and no contact with the general public.

3. Step Five

Finally, after determining that plaintiff did not have any past relevant work, the ALJ proceeded to step five and considered her age, education, work experience, and VE Meola's testimony in concluding that plaintiff could perform other work existing in the national economy, such as that of a labeler, bagger, and microfilm mounter. (AR. 19-20.) As a result, the ALJ found that plaintiff was not disabled within the meaning of applicable law and regulations. Because the ALJ's determination was both well-reasoned and supported by substantial evidence in the record, the Court affirms this conclusion.

\*\*\*

In sum, the Court finds that there is substantial evidence in the record to support the ALJ's conclusion that plaintiff is not disabled within the meaning of the SSA, and that plaintiff had the RFC to perform the full range of work at all exertional levels with certain nonexertional limitations.

---

[2] Accordingly, there is no merit to any contention that "a therapist who has seen [plaintiff] for fifteen years should hold more weight than a psychiatrist that [she] had seen twice, for the case, for a total of less than one hour." (June 8, 2017 Letter, ECF No. 23.)

## IV. Conclusion

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is granted and the decision of the ALJ is affirmed. The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: July 7, 2017
      Central Islip, NY

\* \* \*

Plaintiff is proceeding *pro se*, 10 Kimberly Avenue, Farmingdale, New York 11738. The Commissioner is represented by Assistant United States Attorney Mary M. Dickman, United States Attorney for the Eastern District of New York, 271 Cadman Plaza East, 7th Floor, Brooklyn, New York, 11201.